**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

**EDWARD GORMAN,** *on behalf of
himself and on behalf of all others
similarly situated***,**

      **Plaintiff,**

**v.**                               **CASE NO.: 8:20-cv-02275-CEH-AEP**

**WHELAN EVENT STAFFING
SERVICES, INC., and DATAMAXX
APPLIED TECHNOLOGIES, INC.
d/b/a REDTAIL SECURITY AND
SCREENING,**

      **Defendants.**
_____/

**<u>AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL</u>**

      Plaintiff, Edward Gorman ("Plaintiff"), pursuant to Fed.R.Civ.P. 15(a)(1)(A) and the

Court's Order at Doc. 17, by and through undersigned counsel, and on behalf of himself, the

Putative Classes set forth below, as well as in the public interest, files this First Amended

Class Action Complaint as a matter of right against Defendants, Whelan Even Staffing

Services, Inc.; and Datamaxx Applied Technologies, Inc., d/b/a Redtail Security and Screening

("Datamaxx") under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681a–x.  In

further support thereof Plaintiff states as follows:

**I.**        **<u>NATURE OF THE CASE</u>**

      1.    This FCRA action arises out of Plaintiff's application for employment with

Whelan. The FCRA imposes several important requirements on employers that use a consumer

report for employment purposes (commonly known as a "background check"), which are designed to protect consumers like Plaintiff.

2.    The Plaintiff in this case lost a job with Whelan because a consumer report Redtail provide Whelan on Plaintiff contained erroneous information about a felony charge for which he had been cleared.

3.    Whelan is a nationwide provider of event staffing and security services for sport venues and events, financial institutions, manufacturing & industrial facilities, and retail shopping centers, throughout the United States.[1]

4.    As part of its hiring processes, Whelan and its subsidiaries use background checks to make employment decisions. Because such employment decisions are based in whole or in part on the contents of the background checks, Whelan is obliged to adhere to certain requirements of the FCRA.

5.    Obtaining consumer reports in any context is illegal. To overcome the presumption of illegality and permit access to consumer reports in the employment context, employers like Whelan must provide to applicants like Plaintiff a written disclosure of their intent to obtain a consumer report for employment purposes. That disclosure, the FCRA demands, must be "in a document that consists solely of the disclosure." 15 U.S.C. § 1681b(b)(2)(A)(i).

6.    This provision implements what is commonly known as the "standalone disclosure" requirement.

---

[1] *See* https://www.facebook.com/pg/whelansecurity/about/?ref=page_internal (last accessed June 19, 2020).

7.     After the presentation of the disclosure, the employer must obtain the applicant's written authorization to obtain the report. *Id.* § 1681b(b)(2)(A)(ii).

8.     When using background reports for employment purposes, employers must, before declining, withdrawing, or terminating employment based in whole or in part on the contents of the report, provide job applicants like Plaintiff with a copy of their respective background reports as well as a written summary of their rights under the FCRA.

9.     Providing a copy of the background report as well as a statement of consumer rights before making a final adverse employment decision arms the nation's millions of job applicants with the knowledge and information needed to challenge inaccurate, incomplete, and misleading consumer reports. The FCRA is designed to permit individuals whose reports are inaccurate with ample time to identify the inaccuracies and correct them before the employer has made an employment decision. Even if reports are accurate, the FCRA demands that applicants receive them and their written FCRA rights so that they may preemptively discuss negative information with the potential employers.

10.     Plaintiff brings a nationwide class claim against Whelan under 15 U.S.C. § 1681b(b)(2), for its systematic, willful failure to provide to applicants a standalone disclosure of its intent to obtain consumer reports for employment purposes, and failure to obtain written authorization to obtain such reports.

11.     Plaintiff also brings nationwide class claims against Whelan under 15 U.S.C. § 1681b(b)(3) because, as a systematic omission in its hiring process, Whelan failed to provide Plaintiff and other consumers against whom it took adverse employment actions with a copy

of the background report or a summary of rights under the FCRA before taking that adverse employment action.

12.    This claim involves significant involvement in Whelan's hiring process by Datamaxx Applied Technologies, Inc. ("Datamaxx"), the consumer reporting agency that furnished Plaintiff's inaccurate report to Whelan.

13.    The FCRA also imposes upon Datamaxx multiple requirements and obligations. In the employment context, for example, when a consumer reporting agency ("CRA") like Datamaxx furnishes to an employer a consumer report that contains public-record information that is likely to have an adverse effect on the consumer's ability to obtain employment, the CRA must either (1) provide to the consumer contemporaneous notice that it is providing the report; or (2) utilize strict procedures designed to ensure the public-record information is complete and up-to-date. 15 U.S.C. § 1681k.

14.    Datamaxx did neither for Plaintiff, as it reported criminal history about him that included a felony charge that the state nolle prossed, yet the report did not so state. Datamaxx gave Whelan that report without providing Plaintiff contemporaneous notice that it was doing so, and the information Datamaxx reported was not complete and up-to-date because it did not contain the correct disposition.

15.    Similarly, the FCRA requires that CRAs—regardless of context—employ reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). Datamaxx failed on this score by providing to Whelan a report about Plaintiff that branded Plaintiff a felon when that was not true. Plaintiff is not a felon, yet Datamaxx's report states otherwise.

16.    After his dispute did not yield the appropriate result, Plaintiff wrote to Datamaxx and requested his full FCRA file. When a consumer makes that request, the FCRA requires that the CRA disclose to the consumer all information in his file, including the sources of the information. 15 U.S.C. § 1681g. Datamaxx fell short of this requirement, violating Section 1681g by delivering Plaintiff only a copy of the report it issued to Whelan.

17.    Plaintiff brings nationwide class claims against Datamaxx for its violations of Section 1681k of the FCRA. Datamaxx provided a report to Whelan that contained negative criminal information about Plaintiff but did not provide contemporaneous notice that it was providing the report. Discovery will confirm that Datamaxx makes no effort to comply with the "complete and up-to-date" option under Section 1681k(a)(2), so it must rely on contemporaneous notice to meet the requirements of Section 1681k.

18.    Plaintiff also brings nationwide class claims for Datamaxx's violations of Section 1681g. Plaintiff requested his file disclosure from Datamaxx, and received nothing, indicating Datamaxx has no procedure at all for providing the FCRA-required file disclosure when consumers request one.

19.    Finally, Plaintiff pursues an individual claim for the inaccurate report Datamaxx provided to Whelan. Under Section 1681e(b), Datamaxx was required to use reasonable procedures designed to ensure the maximum possible accuracy of the information it reports. Its reporting was incomplete, leaving out that the state did not prosecute the felony charge, leaving Whelan with the improper, and untrue, impression that Plaintiff was a felon.

## II.    <u>JURISDICTION AND VENUE</u>

20.    The Court has jurisdiction under the FCRA, 15 U.S.C. §§ 1681n and 1681p.

21.    Venue is proper in this Court by virtue of Whelan's removal of the case to this District and Division. Venue is also proper under 28 U.S.C. § 1391(b), as a substantial portion of the acts and omissions giving rise to Plaintiff's claims occurred in this District and Division.

## III.    <u>PARTIES</u>

22.    Plaintiff is a "consumer" as protected and governed by the FCRA.

23.    Whelan is a corporation incorporated in and existing under the laws of the State of Florida with its principal place of business located at 1 Tropicana Drive, St. Petersburg, Florida, which markets its services and employs consumers like Plaintiff throughout the United States, including within this District.

24.    At all times pertinent to this Complaint, Whelan was a "user" of consumer reports as defined and governed by the FCRA.

25.    Datamaxx is a corporation incorporated and existing under the laws of the State of Florida with its principal place of business located at 2001 Drayton Drive Tallahassee, Florida 32311. Datamaxx does business under the name Redtail Security and Screening, which also uses the same address.

26.    Datamaxx is a consumer reporting agency as defined and governed by the FCRA.

## IV.   <u>FACTUAL ALLEGATIONS</u>

**A.   Plaintiff's Application for Employment.**

27.     In June of 2019, Plaintiff sought employment to work for Whelan at Tropicana Field.

28.     On June 20, 2019, Plaintiff completed Whelan's pre-hiring paperwork, including documents Whelan claims permitted it to obtain a consumer report on Plaintiff.

29.     However, none of these materials included a standalone disclosure that was compliant with 15 U.S.C. § 1681b(b)(2).

30.     The purported FCRA disclosure presented to Plaintiff was not clear and conspicuous.  For example, Plaintiff attempted to read the disclosure but was distracted from the disclosure by the presence of additional information, including information about the "REDTAIL Privacy Policy" (REDTAIL is a program utilized by Datamaxx to compile the contents of Plaintiff's consumer report),[2] and the link where it can be viewed.

31.     More distracting, and false, however, was inclusion by Whelan of a statement informing him he would receive access to an "electronic copy" of his report and a summary of his rights under the FCRA (none of which actually happened)

32.     Additional extraneous, and equally violative, information in the disclosure provided by Whelan to Plaintiff included a forced-acknowledgement provision requiring Plaintiff to acknowledge he had provided Whelan with "true and correct" information, which, again, has no place in an FCRA disclosure.

---

[2] *See* https://redtailsecurity.com/Corp/Home/WhyREDTAIL (last accessed on June 19, 2020).

33.    Plaintiff was confused about his rights due to the presence of the additional language contained in Whelan's forms.

34.    This extraneous information confused and misled Plaintiff as to his rights. Specifically, Plaintiff was confused and misled as to exactly his rights were in terms of ***how*** and to ***whom*** he was to dispute the results of the background check before adverse action was taken against him as the disclosure provides no such instructions.

35.    In fact, the form is entirely unclear and confusing as to what Plaintiff needed to do in terms of disputing the information once the purported "access to an electronic copy" of his report was made available, or whether he should also request a mailed version of his report.

36.    Further compounding Plaintiff's confusion, the purported access to an electronic copy was never provided.  Nor was any hard copy.

37.    And, inclusion of the REDTAIL privacy policy link only further pulled Plaintiff's attention away from the disclosure.

38.    Not only that, Plaintiff was also unsure and left to worry if the same incorrect and erroneous information would continue to be reported by additional consumer reporting agencies.

39.    Plaintiff values his privacy rights. If Plaintiff had been aware Whelan had presented him with an unlawful FCRA disclosure—and had he known Whelan would further violate his rights by failing to provide him with pre-adverse notice—Plaintiff never would have allowed Whelan to procure a consumer report on him.

40.    Additionally, in violation of 15 U.S.C. § 1681b(b)(2)(ii), Whelan failed to obtain written authorization from Plaintiff to obtain his consumer report.

41.    Plaintiff interviewed with Whelan on around June 21, 2019.

42.    That day, June 21, 2019, Plaintiff was offered a job with Whelan conditioned on his passing a background check.

43.    Specifically, on June 21, 2019 Plaintiff was informed by Whelan via email as follows:

> Thank you for joining us at our recent hiring event. After concluding the processing of your application we are excited to offer you a position on our team! You will now have access to our Whelan Scheduling Site and Our Paystub Site. Attached/Below are the instructions on how to log in. Also attached is a parking map. When you arrive for your event shifts please park in lots 11-14 and Enter Lower Gate 6 (Employee Entrance.) Reminder, Uniform consists of black pants with a black belt, black shoes and a plain white shirt!

44.    For the next few weeks, Plaintiff waited patiently for Whelan to tell him when to start working. In fact, in reliance on Whelan's above job offer, Plaintiff turned down other potential jobs.

45.    Unbeknownst to Plaintiff, on June 26, 2019 Datamaxx completed the consumer report on him and supplied it to Whelan. No copy was provided to Plaintiff, nor did he receive a 15 U.S.C. § 1681k notice from Datamaxx indicating it was reporting negative information about him.

46.    In the report, Datamaxx determined that Plaintiff could not be hired under Whelan's existing requirements based on his consumer report. This is further evidenced by the Datamaxx "FLAGGED" label contained in Plaintiff's June 26, 2019 report.

47.    This process, commonly known as "adjudication," occurs without the employer's knowledge or involvement. The CRA compares the results of its own background

report with the employer's pre-provided hiring criteria and determines whether the applicant meets those criteria.

48.    Those who do not, like Plaintiff, are marked as "flagged," which is essentially a signal to the employer that the applicant cannot be hired. In other words, applicants whose reports are "flagged" by Datamaxx will not be hired by Whelan.

49.    Discovery will show this flagging of reports by Datamaxx is an "adverse action" as that term is used and interpreted under the FCRA, as Whelan adopts the decision as its own and, without taking any other steps, immediately considers the applicant as rejected for or terminated from employment.

50.    Datamaxx immediately conveyed the information in the report and the adverse action decision to Whelan, but did not notify Plaintiff about the derogatory report at the time it was reported to Whelan.

51.    Discovery will show that Whelan's decision not to hire Plaintiff did not involve any human discretion, and was rendered and final on June 26, 2019 when Datamaxx determined that the criminal history it had compiled required Plaintiff's termination and communicated the "flagged" adjudication to Whelan.

52.    The consumer report supplied by Datamaxx about Plaintiff to Whelan contained erroneous information about Plaintiff. Specifically, the erroneous report stated the Plaintiff had an alleged felony record for "Failure to Return Hired Leased Property" from 2014 in Pinellas county, Case Number 14-CF-012541-A.

53.    The disposition was listed as "Not Found" when, in fact, the actual disposition was Nolle Prosequi after Plaintiff was cleared of all charges.

54.     Had Datamaxx obtained the actual court records relating to Plaintiff, it would have learned the proper disposition of the charge.

55.     Errors like the one Datamaxx committed on Plaintiff's report are the result of CRAs using information that they buy in bulk, which are often summaries or incomplete compilations of criminal-history data. Obtaining original court records from courthouses is more costly, but CRAs make use of bulk data in the name of sacrificing accuracy in favor of profit.

56.     From late June of 2019 through September of 2019 Plaintiff waited for Whelan to tell him when to report for work.

57.     Finally, after reaching out to Whelan multiple times via email, on September 20, 2019, Whelan informed Plaintiff via email that he was not being hired due to a felony charge contained in his background check.

58.     In actuality, however, the final decision not to hire Plaintiff occurred in June, when Datamaxx adjudicated him as "flagged" and communicated that decision to Whelan.

59.     Specifically, the email from Whelan's Event Coordinator, Lee Markham, read as follows:

> Hi Edward, I check[ed] with my superiors and after looking at your background check, we noticed a felony charge in 2014 and therefore will not be to proceed with bringing you on board at this time. Thank you for your interest in WESS.

60.     As Plaintiff works security and has a clean criminal record, this news was devastating to him not only because he lost a job and income he was counting on, but also because a felony record was being attributed to him for which he had been cleared.

61.     The September 20, 2019 email Plaintiff received informing him he was fired did not include the complete report on which Whelan based its decision to not hire Plaintiff. Nor did it include a copy of the required summary of rights under the FCRA.

62.     Even if the email had included such documents, they still would have come far too late because the final, adverse hiring decision occurred when Datamaxx adjudicated Plaintiff's report.

63.     Plaintiff immediately attempted to reach out to Whelan via email and by phone, to explain that, in fact, the felony charge Whelan was referring to had been *nolle prossed*, and even provided to Whelan copies of supporting court documents. But his efforts were useless.

64.     From approximately September 23, 2019 through October 10, 2019, Plaintiff sent multiple emails to Whelan, and specifically to Mr. Markham, in which Plaintiff repeatedly inquired about the status of his dispute as to the contents of his background check.

65.     During that time Plaintiff received a few emails indicating Whelan was considering his situation, including one dated September 23, 2019 indicating that Mr. Markham was ". . . still working on that with corporate to see if we can put you through to the next step. Thank you for following up."

66.     But that was it. Plaintiff received no further information from Whelan. His subsequent efforts to call and email Whelan about his job were ignored entirely.

67.     As set forth above, Whelan failed to provide Plaintiff with at least five business days' written advance notice of the fact that Plaintiff it would take adverse action against him based on the results of his consumer report.

68.     And, as also set forth above, Whelan failed to provide Plaintiff with a copy of his consumer report, and a written summary of his FCRA rights along with that notice, at least five business days before taking adverse action against him.

69.     Ultimately, Plaintiff lost his job with Whelan because of Whelan's reliance on the contents of erroneous and inaccurate background check.

70.      After Plaintiff's termination, on February 7, 2020 Plaintiff requested copy of this "full file" from Datamaxx, as permitted by the FCRA, as he had never seen exactly what was in his background check and he was worried about being able to get other jobs going forward.

71.     Rather than responding by providing him with copy of his full file disclosure, Datamaxx responded to the "full file" disclosure on March 3, 2020 by simply sending Plaintiff a copy of the erroneous and inaccurate consumer report it had supplied to Whelan on June 26, 2019.

72.     Plaintiff then launched a formal dispute with Datamaxx on or about March 20, 2020.

73.     Datamaxx initiated a reinvestigation as a result of Plaintiff's dispute and, on April 16, 2020, Datamaxx informed Plaintiff that it corrected his report.

74.     Of course, all of this was done too late as Plaintiff had already lost his job.

**B.     Whelan's Practices and Policies.**

75.     Whelan has created and implemented national, uniform hiring and staffing policies, procedures, and practices under which it and its subsidiaries and vendors operate.

Those policies, procedures, and practices cover the use of "background checks" or "consumer reports" to screen potential employees for Whelan and its vendors.

76.     Whelan routinely uses consumer reports to screen prospective employees and those who would work for Whelan.

77.     Whelan also routinely fails to provide applicants with a standalone disclosure of its intent to obtain consumer reports about them. Therefore, any written authorization Whelan may obtain is faulty and legally invalid.

78.     Whelan subsequently violates the FCRA with each background check it obtains about an applicant, and did so for each member of the Class described below.

79.     As a matter of practice, Whelan regularly fails to provide copies of the FTC or CFPB notice of rights to job applicants against whom it takes an adverse action based in whole or part on a consumer report, before taking that adverse action.

80.     Discovery will show Whelan relies on Datamaxx to make its hiring decisions, relying on Datamaxx's adjudications of "flagged" as its own, final decisions.

81.     Discovery will confirm that Whelan adopts the flagged adjudication as its own final hiring decision, and that it does not—as a matter of regular, nationwide practice—hire individuals whose reports reflect that adjudication result.

82.     As a matter of course, Whelan uses the same business process for obtaining and using consumer reports as it did with Plaintiff and members of the Class described below. Whelan routinely as a matter of course takes adverse actions against applicants without first providing them with a copy of the report and summary of their FCRA rights.

83.     As a result of these FCRA violations, Whelan is liable to Plaintiff, and to each Class Member, for statutory damages from $100 to $1,000 pursuant to 15 U.S.C. § 1681n(a)(1)(A), plus punitive damages pursuant to 15 U.S.C. § 1681n(a)(2), and attorneys' fees and costs pursuant to 15 U.S.C. §§ 1681n and 1681o.

84.     Whelan's conduct and omissions were willful. Because the FCRA was enacted in 1970, Whelan has had years to become compliant but has failed to do so.

85.     Whelan, a nationwide employer, was aware of obligations under the FCRA as they relate to employment because it hired OCG not only to perform its background checks but also to (attempt to) provide Whelan's adverse-action notices to job applicants. Whelan is a large corporation with in-house counsel and regularly engages outside counsel, meaning it had ample means and opportunity to seek legal advice regarding its FCRA responsiblities. Whelan therefore knew of the requirements imposed upon it by the FCRA, and failed to craft a system that would ensure compliance with those requirements.

**C.      Datamaxx's Practices and Policies.**

86.     As a nationwide CRA, Datamaxx operates every day under the FCRA. It is therefore aware of the Act's requirements on its business.

87.     Datamaxx has created and implemented national, uniform policies, procedures, and practices for creating consumer reports. Those policies, procedures, and practices cover the obtaining of information that goes into reports, matching that information to the subjects of searches, and providing reports to employers like Whelan.

15

88.    In providing reports for employment purposes, Datamaxx fails to employ strict procedures designed to ensure the public-record information, such as criminal history, is complete and up-to-date.

89.    Without such strict procedures in place, Datamaxx must rely on the provision of contemporaneous notice to comply with Section 1681k(a) of the FCRA.

90.    Datamaxx's procedures, however, do not include the sending of such notice to consumers, so Datamaxx violates Section 1681k(a) with every report it issues that contains negative public-record information.

91.    Datamaxx, like nearly all CRAs that create background checks, does not rely on original court records when it reports criminal history. Instead, they purchase records in bulk, which are notoriously inaccurate, do not contain all of the details that original records do, and are often summaries of charges and outcomes rather than the full records.

92.    When Datamaxx receives a request from a consumer for the consumer's file disclosure, Datamaxx does not reveal the sources of the information it uses to create background checks. It instead merely provides a copy of the report that the consumer has likely already seen, which is of little help to consumers like Plaintiff.

93.    That is because in order to ensure that errors are corrected and do not recur, consumers need to know every link in the reporting chain. If Plaintiff were able to learn, for example, the source of the data that went into his Datamaxx report, he would contact that source and have it correct the problem that it passed on to Datamaxx and that ended up in Datamaxx's report to Whelan.

94.      Such transparency is a foundational goal of the FCRA and Section 1681g, and Datamaxx frustrates this purpose by depriving consumers of the information Congress has deemed them entitled to.

95.      Similarly, accuracy is a fundamental aspect of the FCRA and Section 1681e(b). When Datamaxx created the report for Whelan, it was duty bound to use reasonable procedures designed to assure the maximum possible accuracy of the information in the report.

96.      Datamaxx failed in that responsibility, failing to accurately report Plaintiff's criminal history. Rather than correctly reporting that the felony charges had been dropped, Datamaxx gave readers the mistaken impression that the case is ongoing by noting the disposition of the charges as "not found."

97.      As a matter of course, Datamaxx works these same failures across all reports it issues and as to all consumers with whom it communicates. Nothing about Plaintiff's circumstances were accidental or isolated. All that occurred as to Plaintiff went exactly as Datamaxx has instructed its employees and programmed its systems to function.

98.      As a result of these FCRA violations, Datamaxx is liable to Plaintiff, and to each Class Member as described below, for statutory damages from $100 to $1,000 pursuant to 15 U.S.C. § 1681n(a)(1)(A), plus punitive damages pursuant to 15 U.S.C. § 1681n(a)(2), and attorneys' fees and costs pursuant to 15 U.S.C. §§ 1681n and 1681o.

99.      Datamaxx is also liable to Plaintiff for his actual damages on his individual claim for the inaccurate report Datamaxx issued to Whelan pursuant to 15 U.S.C. § 1681o.

100.      Datamaxx's conduct and omissions were willful. Because the FCRA was enacted in 1970, Datamaxx has had years to become compliant but has failed to do so.

101.    Datamaxx, a nationwide CRA, was aware of obligations under the FCRA as they relate to employment because it provided FCRA-governed reports to Whelan. Discovery will show that Datamaxx attempted to obtain from Whelan certifications as required by the FCRA, so it is keenly aware of the statute's existence and at least some of the statute's requirements.

102.    Datamaxx is a large corporation with in-house counsel and regularly engages outside counsel, meaning it had ample means and opportunity to seek legal advice regarding its FCRA responsiblities. Datamaxx therefore knew of the requirements imposed upon it by the FCRA, and failed to craft a system that would ensure compliance with those requirements.

## V.    LEGAL REQUIREMENTS

**A.    The FCRA Provisions Applicable To Employers.**

103.    The FCRA prohibits the obtaining of consumer reports in any context unless certain requirements are met. The most-fundamental of these requirements in the employment context is the standalone disclosure requirement.

104.    Section 1681b(b)(2) of the FCRA sets out the standalone disclosure requirement:

> **In general.** Except as provided in [circumstances not present here], a person may not procure a consumer report, or cause a consumer report to be procured, for employment purposes with respect to any consumer, unless--
>
> (i) a clear and conspicuous disclosure has been made in writing to the consumer at any time before the report is procured or caused to be procured, in a document that consists solely of the disclosure, that a consumer report may be obtained for employment purposes; and

> (ii) the consumer has authorized in writing (which authorization
> may be made on the document referred to in clause (i)) the
> procurement of the report by that person.

105.    Failing to provide any disclosure at all of course violates the statute, but so too

does the provision of a disclosure that is not standalone. Adding superfluous information,

inapplicable state-law notices or warnings, or making the document unnecessarily wordy and

confusing likewise violates the statute.

106.    The purpose of this requirement is to give applicants unequivocal notice of the

employer's intent to obtain a background check and to further confirm that the consumer

authorizes such through his or her signature.

107.    Section 1681b(b)(3)(A) of the FCRA regulates the conduct of any person who

uses a "consumer report" to take an adverse action against any employees or prospective

employees as follows:

> Except as provided in subparagraph (B) [in cases of a consumer
> applying for a position over which the Secretary of
> Transportation may establish qualifications], in using a
> consumer report for employment purposes, before taking any
> adverse action based in whole or in part on the report, the person
> intending to take such adverse action shall provide to the
> consumer to whom the report relates --
>
> (i)      a copy of the report; and
>
> (ii)     a description in writing of the rights of the consumer
> under this subchapter, as prescribed by the Federal Trade
> Commission under section 1681g(c)(3) of this title.

108.    The Act defines adverse action as "a denial of employment or any other decision

for employment purposes that adversely affects any current or prospective employee," and "an

action taken or determination that is adverse to the interests of the consumer." 15 U.S.C. § 1681a(k)(1)(B)(ii), (iv).

109.    The statute notably does not indicate a decision must be final and irreversible to fit the definition of adverse.

110.    The purpose of § 1681b(b)(3)(A) is to provide a prospective or current employee a sufficient amount of time to review the consumer report, correct any inaccuracies, to notify the prospective employer of these inaccuracies before an adverse action is taken and generally to discuss the contents of the report with the prospective employer so that the applicant may still be hired.

111.    This statutory requirement was enacted by Congress expressly to protect consumer privacy by restricting the circumstances under which a person (in this instance Whelan) could obtain and use a consumer's personal information consumer report.

112.    In enacting this FCRA provision, Congress also expressly sought to guarantee important material information be provided to Plaintiff, and consumers like him, with respect to employer use of a consumer report for an employment adverse action.

113.    Plaintiff and each putative Class Member has been substantively harmed and injured by Whelan in the violation of their personal privacy and in the deprivation of the congressionally mandated information.

**B.    The FCRA Requirements For CRAs.**

*The FCRA's Transparency Requirements for Consumer Reporting Agencies*

114.    Chief among the FCRA's broad protections are those that permit consumers to learn the information CRAs traffic about them.

115.    The Act therefore requires CRAs to provide, at consumers' request, all information in the consumer's file at the time of the request, including sources of that information that CRAs possess about the requesting consumer. 15 U.S.C. § 1681g(a). This information is commonly called the consumer's "full file disclosure."

116.    It is insufficient to simply provide the consumer with a report the CRA gave to a third party. *See id.*

117.    Notably, there is nothing in the statute that permits a CRA to avoid this duty of full disclosure.

118.    Such a provision was enacted for precisely situations like Plaintiff's. Defendant Datamaxx provided to Whelan inaccurate information about Plaintiff. For Plaintiff to correct those inaccuracies, he has to know the sources involved so he can contact them and have their records revised. If he does not know all the players who had a hand in furnishing information that went into his report, he cannot be certain that he has prevented the inaccuracies from resurfacing on the next report Datamaxx, or someone else, creates about him.

119.    When Plaintiff contacted Datamaxx and requested his full file disclosure, Datamaxx did not provide it. Instead, all he received was the report provided to Whelan, which does not tell him where the information he received actually came from.

120.    While Datamaxx will likely claim that the report to Whelan does contain the sources of information, courts for example, it is widely known that CRAs buy bulk criminal-history information from third parties who are not courts.

121.    Without knowing who these third-party vendors are, Plaintiff and other consumers are powerless to correct inaccurate information they may possess and pass-on to others like Datamaxx.

*Maximum Possible Accuracy for Consumer Reporting Agencies*

122.    The FCRA imposes on CRAs the requirement that, for every report they create, the employ reasonable procedures designed to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b).

123.    Such duty accompanies any report governed by the FCRA, and evinces Congress's intent that CRAs carefully carry-out their businesses such that their reports are as correct as possible.

124.    This accuracy provision applies in every context in which consumer reports are exchanged, meaning it is not limited to solely reports that are issued for employment purposes like some of the other provisions at issue here.

125.    Datamaxx fell short of those duties, as its procedures unreasonably failed to parse the information it possessed to ensure that it reported records attributable to Plaintiff and that those records reflected the correct, final results of those cases.

126.    Discovery will show, for example, that original court records contained the correct disposition of Plaintiff's criminal charges. Reporting the dispositions as "not found," as Datamaxx did, is demonstrably inaccurate when compared against the original court records.

127.    Had Datamaxx consulted the original court records, it could have learned the correct disposition of Plaintiff's charges and supplied that information to Whelan.

128.    The failure of Datamaxx on at least this point shows its procedures for compiling the records and reporting them to Whelan were unreasonable and error-prone.

129.    Discovery will show Datamaxx adopted these inadequate procedures solely for profit's sake, and it is more costly to obtain original court records.

130.    Datamaxx prefers the error-prone methods they use because they are cheaper and allow for greater profit per report.

### The Notice Requirement in the
### Employment Context for Consumer Reporting Agencies

131.    15 U.S.C. § 1681k(a) requires CRAs like Datamaxx to provide timely and lawful notice that they are furnishing an employment purposed consumer report that contains derogatory information at the time they did so.

132.    This important requirement is intended to provide consumers immediate notice of the furnishing of the employment report and details necessary to preemptively contact the consumer-reporting agency to obtain and, as appropriate, correct information in the furnished report. It also was intended to alert the consumer to the employer's use of the report to provide consumers the opportunity to address any concerns or derogatory history in the report directly with the employer.

133.    Though a nationwide CRA was involved in the creation and provision of the report about Plaintiff to Whelan, and that report contained entries of negative criminal history that would likely adversely affect Plaintiff's ability to be employed by Whelan, Plaintiff never received any notice from Datamaxx that it was furnishing such report.

134.    Plaintiff alleges that Datamaxx did not attempt for any consumer to follow the option available at 15 U.S.C. § 1681k(a)(2). The alternative would only be applicable if Datamaxx had in place before any report was furnished strict procedures designed to ensure that it actually contacted the original source of public records information (*e.g*., the Court clerk or the DMV) before furnishing a report which includes such information to insure that the information it included in its reports was the complete and up-to-date public record. A § 1681k(a)(2) option is not available to Datamaxx because the public records it furnishes to third parties are summaries, indexes, or partial records. Datamaxx never furnished the complete and up-to-date public record as Section 1681k(a)(2) envisions. That Section is thus inapplicable to the consumer reports at issue in this case.

## VI.    WHELAN ACTED WILLFULLY

135.    Whelan knew or should have known about its legal obligations under the FCRA. These obligations are well established in the plain language of the FCRA and in the promulgations of the Federal Trade Commission and Consumer Financial Protection Bureau. Whelan obtained or had available substantial written materials, which apprised it of its duties under the FCRA.

136.    An employer like Whelan is absolutely forbidden from obtaining a background check without first providing a standalone disclosure. Such has been the subject of considerable litigation, giving Whelan ample notice of the requirement and the ability to become compliant.

137.    Before a person takes an adverse employment action, it must provide two documents to the prospective employee. *See* Letter from Clark W. Brinckerhoff to Erick J.

Weisberg (June 27, 1997), FTC Informal Staff Letter ("Brinckerhoff Letter II") (noting that taking action a period of five business days after notice "appears reasonable."); *Williams v. Telespectrum, Inc.,* Civil Action No. 3:05cv853 (E.D. Va. 2006), Report and Recommendation of Magistrate Judge Hannah Lauck dated November 7, 2006, adopted by Judge R. Payne January 8, 2005, (holding that a user of a consumer report must provide to the consumer a copy of the report and disclosure of rights a sufficient amount of time before it takes adverse action so that the consumer can rectify any inaccuracies in the report, and simultaneous provision of the report does not satisfy this requirement); *Kelchner v. Sycamore Manor Health Ctr.*, 305 F. Supp. 2d 429, 435 (M.D. Pa. 2004); (holding a reasonable period for the employee to respond to disputed information is not required to exceed five business days following the consumers receipt of the consumer's report from the employer); *Beverly v. Wal-Mart Stores, Inc.*, No. 3:07-cv-469 (E.D. Va. 2009) (consent Order providing ChoicePoint mailing of Adverse Action Notices on behalf of its customers shall occur no earlier than five business days after the mailing of the pre-adverse action notices).

138.    To ensure knowing compliance with the FCRA, Congress requires that before any consumer reporting agency may provide consumer reports on an applicant, the reporting agency must have obtained a certification from the employer that it will comply with 15 U.S.C. § 1681b(b)(3) whenever the employer decides to take adverse action based in whole or in part on the consumer report.  15 U.S.C. § 1681b(b)(1)(A).

139.    Discovery will show that Whelan knowingly executed a certification providing that it would comply with the various provisions of the FCRA, including those regarding the

standalone disclosure and whenever adverse action was contemplated or taken based in whole or in part on information contained in a consumer report.

140.    Despite its certification, Whelan knowingly violated 15 U.S.C. §§ 1681b(b)(2) and (b)(3).

141.    Despite knowing of these legal obligations, Whelan acted consciously in breaching its known duties and depriving Plaintiff and other members of the putative Classes of their rights under the FCRA.

142.    As a result of these FCRA violations, Whelan is liable to Plaintiff and to each Class Member for statutory damages from $100 to $1,000 pursuant to 15 U.S.C. § 1681n(a)(1)(A), plus punitive damages pursuant to 15 U.S.C. § 1681n(a)(2) for the violations alleged herein, and for attorneys' fees and costs pursuant to §§ 1681n and 1681o.

## VII.    DATAMAXX ACTED WILLFULLY

143.    Likewise, Datamaxx knew or should have known about its legal obligations under the FCRA. These obligations are well established in the plain language of the FCRA and in the promulgations of the Federal Trade Commission and Consumer Financial Protection Bureau. Datamaxx obtained or had available substantial written materials, which apprised them of their duties under the FCRA.

144.    Datamaxx's willful conduct is further reflected by, among other things, the following facts:

    a.    Datamaxx provided no notice to Plaintiff that it was providing to Whelan a consumer report that contained negative criminal history at the time it did so (or at all, for that matter). This failure was either knowing or reckless;

    b.    Datamaxx does not have in place reasonable procedures designed to assure the maximum possible accuracy of information it reports. As with Plaintiff, a

criminal record Datamaxx reported indicated the disposition was "not found," leaving the reader with the incorrect impression that the case was ongoing or not resolved. A reasonable procedure would have sought the original court records to learn the correct disposition rather than stating that six-year-old records had no disposition. Such failures are at least reckless, if not knowing;

c.      Datamaxx does not provide proper file disclosures. Turning over to a consumer the same report that a CRA has given an employer is not the same thing as providing "[a]ll information in the consumer's file at the time of the request," as well as "[t]he sources of the information." 15 U.S.C. § 1681g(a)(1), (2). This is one of the simplest FCRA requirements to follow, as all it demands is that a CRA give consumers everything in their possession and tell consumers where they got it. Such failures are at least reckless, if not knowing;

d.      The FCRA was enacted in 1970, giving Datamaxx 50 years to become compliant;

e.      Datamaxx is a company with access to legal advice through their own general counsel's office and/or outside litigation counsel;

f.      Datamaxx knew or had reason to know that their conduct was inconsistent with FTC guidance, case law, and the plain language of the FCRA;

g.      Datamaxx voluntarily ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless; and

h.      Datamaxx's violations of the FCRA were repeated and systematic, and they were carried out not by accident or oversight, but exactly as Defendants intended.

145.    As a result of these FCRA violations, Datamaxx is liable to Plaintiff and to each Class Member for statutory damages from $100 to $1,000 pursuant to 15 U.S.C. § 1681n(a)(1)(A), plus punitive damages pursuant to 15 U.S.C. § 1681n(a)(2) for the violations alleged herein, and for attorneys' fees and costs pursuant to §§ 1681n and 1681o.

146.    For Plaintiff's individual claims, Datamaxx is a liable for Plaintiff's actual damages pursuant to 15 U.S.C. § 1681o, plus punitive damages pursuant to 15 U.S.C. §

1681n(a)(2) for the violations alleged herein, and for attorneys' fees and costs pursuant to §§

1681n and 1681o.

## VIII.   <u>CLASS ACTION ALLEGATIONS</u>

### DISCLOSURE CLASS – VIOLATION OF FCRA § 1681b(b)(2)

147.    Plaintiff brings this action for himself and on behalf of a class (the "Standalone

Disclosure Class"), or which he is a member:

> **All consumers in the United States who applied for a position or promotion at Whelan for the period five years before the filing of this lawsuit.**

### ADVERSE ACTION CLASS – VIOLATION OF FCRA § 1681b(b)(3)(A)(i)

148.    Plaintiff brings this action for himself and on behalf of a class (the "Adverse

Action Class"), or which he is a member:

> **All consumers in the United States against whom Whelan took adverse employment action based, in whole or in part, on information contained in a consumer report obtained within five years preceding the filing of this lawsuit.**

### FILE DISCLOSURE CLASS – VIOLATION OF THE FCRA, § 1681g

149.    Plaintiff brings this action for himself and on behalf of a class (the "File

Disclosure Class"), or which he is a member:

> **All consumers in the United States who requested their consumer file disclosures from Datamaxx or Redtail within the period five years before the filing of this lawsuit through the date on which the Court certifies a class in this action.**

### 1681k NOTICE CLASS – VIOLATION OF THE FCRA § 1681k(a)

150.    Plaintiff brings this action for himself and on behalf of a class (the "1681k

Notice Class"), or which he is a member:

> **All consumers in the United States (1) for whom Datamaxx or Redtail created consumer reports for employment purposes, (2) which reports contained public-record information likely to have an adverse effect on those consumers' employment prospects, and (3) to whom Datamaxx or Redtail did not provide to those consumers contemporaneous notice that they were providing such reports.**

151.    **Numerosity.** The Classes are so numerous that joinder of all members is impracticable. Based on information and belief, the Classes are comprised of at least thousands of members who are geographically dispersed throughout the country so as to render joinder of all Class Members impracticable.  The names and addresses of the Class Members are identifiable through documents maintained by Whelan or Datamaxx, and the Class Members may be notified of the pendency of this action by published and/or mailed notice.

152.    **Existence and Predominance of Common Questions of Law and Fact.** Common questions of law and fact exist as to all members of the Classes. The total focus of the litigation will be Defendants uniform conduct and procedures; whether Defendants provided the required disclosures and notices; when they did so; and, whether Defendants acted willfully in its failure to design and implement procedures to assure compliant delivery and/or timing of these notices.  The appropriate amount of uniform statutory and/or punitive damages under 15 U.S.C. § 1681n is a common question for members of the Classes.

153.    **Typicality.** Plaintiff's claims are typical of the other Class Members' claims. As described above, Defendants use common practices and automated systems in committing the conduct that Plaintiff alleges damaged him and the Classes. Plaintiff seeks only statutory and punitive damages for his class-wide claims and, in addition, Plaintiff is entitled to relief under the same causes of action as the other members of the Class. Defendants uniformly

breached the FCRA by engaging in the conduct described above, and these violations had the same effect on each member of the Class.

154.    **Adequacy.** Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff's interests coincide with, and are not antagonistic to, other Class Members' interests. Additionally, Plaintiff has retained counsel experienced and competent in complex, commercial, multi-party, consumer, and class-action litigation. Plaintiff's counsel has prosecuted complex FCRA class actions across the country.

155.    **Superiority.** Questions of law and fact common to the Classes predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The statutory and punitive damages sought by each member are such that individual prosecution would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for the members of the Class to, individually, effectively redress the class-wide wrongs done to them, particularly in light of the fact that the claims are in part based on the failure of Defendants to give Class Members the proper disclosure and notice. Even if the members of the Classes themselves could afford such individual litigation, it would be an unnecessary burden on the courts.

156.    Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court

by allowing the Court to resolve numerous individual claims based upon a single set of proof in just one case.

157.    There are no known unusual legal or factual issues that would cause management problems not normally and routinely handled in class actions. Because Class Members in each Class that Plaintiff seeks to represent may be unaware that their rights have been violated or, if aware, would be unable to litigate their claims on an individual basis because of their relatively small damages, a class action is the only practical proceeding available.  To Plaintiff's knowledge, no other similar actions are pending against Defendants. This forum is appropriate for litigation because Defendants conduct business in this District and the conduct complained of herein occurred here.

## IX.    CAUSES OF ACTION

### COUNT ONE: VIOLATIONS OF 15 U.S.C. § 1681b(b)(2)
### Class Claim Against Whelan

158.    Plaintiff incorporates by reference those paragraphs set out above, 1-19, 22-85, 103-113, 135-142, 147, and 151-157, as though fully set forth herein.

159.    Whelan's failure to provide members of the Class with a standalone disclosure before obtaining consumer reports for employment purposes violated 15 U.S.C. § 1681b(b)(2)(A).

160.    If Whelan then obtained an authorization from applicants, that authorization fails because it was not based on an appropriate disclosure.

161.    Whelan's obtaining and use of Class Member consumer reports without compliance with § 1681b(b)(2) violates 15 U.S.C. § 1681b(f) as well as § 1681b(b)(2).

162.    The conduct, action, and inaction of Whelan was willful, rendering it liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Whelan acted in deliberate or reckless disregard of its obligations and the rights of Plaintiff and other Disclosure Class members under 15 U.S.C. § 1681b(b)(2).

163.    Whelan knew or should have known of its legal obligations under the FCRA. These obligations are well-established in the plain language of the statute and published circuit court authority. Whelan obtained or otherwise had available substantial written materials that apprised Whelan of its duties under the FCRA. Any reasonable employer knows of the existence of these FCRA mandates, or can easily discover their substance.

164.    Moreover, at the time Whelan failed to follow 15 U.S.C. § 1681b(b)(2), a plethora of FTC opinions and case law advising how Whelan should conduct itself existed.

### COUNT TWO: VIOLATIONS OF 15 U.S.C. § 1681b(b)(3)(A)
### Class Claim Against Whelan

165.    Plaintiff incorporates by reference those paragraphs set out above, 1-19, 22-85, 103-113, 135-142, 148, and 151-157, as though fully set forth herein.

166.    Whelan's failure to provide members of the Class with a copy of the consumer report upon which it based its decision to take the adverse action, prior to taking such action, violated 15 U.S.C. § 1681b(b)(3)(A).

167.    Whelan's obtaining and use of Class Member consumer reports without compliance with § 1681b(b)(3) violates 15 U.S.C. § 1681b(f).

168.    The conduct, action, and inaction of Whelan was willful, rendering it liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Whelan acted in deliberate or reckless disregard of its obligations and the

rights of Plaintiff and other Adverse Action Class members under 15 U.S.C. § 1681b(b)(3)(A). Whelan knew or should have known of its legal obligations under the FCRA. These obligations are well established in the plain language of the statute and published circuit court authority. Whelan obtained or otherwise had available substantial written materials that apprised Whelan of its duties under the FCRA. Any reasonable employer knows of the existence of these FCRA mandates, or can easily discover their substance.

169.    Moreover, at the time Whelan failed to follow 15 U.S.C. § 1681b(b)(3)(A) a plethora of FTC opinions and case law existed.

### *Plaintiff's First Concrete Injury:*
### *Economic Damages and Lost Job*

170.    As a result of Whelan's forgoing actions Plaintiff suffered a concrete economic injuries when he lost his job with Whelan, lost out on other job opportunities, and the resulting loss in income.

### *Plaintiff's Second Concrete Injury:*
### *Informational Injury*

171.    Plaintiff suffered a concrete informational injury because Whelan failed to provide Plaintiff with information to which he was entitled to by statute, namely a standalone disclosure, before obtaining a consumer report for employment purposes about her.

172.    By enacting Section 1681b(b)(2), Congress codified a new right—to information in the form of a standalone disclosure of the employer's intent to obtain a consumer report for employment purposes.

173.    Plaintiff suffered a concrete informational injury because Whelan failed to provide Plaintiff with information to which he was entitled to by statute, namely a standalone disclosure.

174.    Plaintiff's "inability to obtain [that] information" is therefore, standing alone, "a sufficient injury in fact to satisfy Article III." *Spokeo Inc. v. Robins,* 136 S. Ct. 1540, 1549 (2016).

### Plaintiff's Third Concrete Injury: Inability to Learn of the Contents of His Report and Tell His Side of the Story in Time to Save His Job

175.    Whelan's failure to provide timely notice deprived Plaintiff and Class Members of the opportunity to learn about the information in their consumer report and tell Whelan their side of the story before Whelan took adverse action.  Thus, Plaintiff was denied the opportunity to determine if the information contained in his consumer report was accurate, to plead his case, and to understand how it might affect his future efforts to obtain employment.

176.    With these two recognized injuries directly traceable to Whelan's failure to timely provide the notices required by § 1681b(b)(3), Plaintiff unquestionably has established Article III standing.

177.    Plaintiff and other members of the Class are entitled to recover costs and attorneys' fees as well as appropriate equitable relief from Whelan in an amount to be determined by the Court, pursuant to 15 U.S.C. § 1681n.

### COUNT THREE: VIOLATIONS OF 15 U.S.C. § 1681g Class Claim Against Datamaxx

178.    Plaintiff incorporates by reference paragraphs 12-19, 22-74, 86-102, 114-134, 143-146, and 149-157, as though fully set forth herein.

179.    Datamaxx's failure to provide members of the File Disclosure Class with their full consumer files upon request violated 15 U.S.C. § 1681g(a).

180.    Datamaxx failed to produce the information it possessed, despite each consumer's valid request for a copy of their file pursuant to § 1681g(a). Datamaxx also failed to provide Plaintiff notice of his rights under the FCRA, as required by § 1681g(c)(2).

181.    The conduct, action, and inaction of Datamaxx were willful, rendering it liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Datamaxx acted in deliberate or reckless disregard of its obligations and the rights of Plaintiff and other File Disclosure Class Members under 15 U.S.C. § 1681g.

182.    As a result of Datamaxx's conduct, Plaintiff has suffered particularized and concrete injuries, including being robbed of his congressionally mandated right to information to which Congress has deemed him entitled. Access to this information is important because (1) it is highly personal in nature, (2) it is maintained and reported by third parties with who Plaintiffs have no pre-existing relationship, (3) it is ultimately sold to third parties to whom Plaintiff is applying for employment or credit without Plaintiff having the opportunity to view it in advance, (4) it is potentially determinative information in extremely important interactions—applications for employment or credit, and (5) Damataxx should include a notice of consumers' substantive rights under applicable federal law.

183.    Having been denied this important information, Plaintiff was harmed because he did not know what information was circulated about him and was subsequently denied an opportunity to correct inaccurate or obsolete information. As a result, Plaintiff was at increased risk to be denied employment.

184.    Datamaxx knew or should have known of its legal obligations under the FCRA. These obligations are well-established in the plain language of the statute and published circuit court authority. Datamaxx obtained or otherwise had available substantial written materials that apprised Datamaxx of its duties under the FCRA. Any reasonable CRA knows of the existence of these FCRA mandates, or can easily discover their substance.

185.    Moreover, at the time Datamaxx failed to follow 15 U.S.C. § 1681g, a plethora of FTC opinions and case law advising how Datamaxx should conduct itself existed.

186.    Plaintiff is entitled to recover costs and attorneys' fees as well as appropriate equitable relief from Datamaxx in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

187.    As a result of these FCRA violations, Datamaxx is liable to Plaintiff and the Class for statutory damages from $100 to $1,000 pursuant to 15 U.S.C. § 1681n(a)(1)(A), plus punitive damages pursuant to 15 U.S.C. § 1681n(a)(2), and for attorneys' fees and costs pursuant to § 1681n.

### COUNT FOUR: VIOLATIONS OF 15 U.S.C. § 1681k(a)(1)
### Class Claim Against Datamaxx

188.    Plaintiff incorporates by reference paragraphs 12-19, 22-74, 86-102, 114-134, 143-146, and 149-157, as though fully set forth herein.

189.    Datamaxx failed to send the required § 1681k(a)(1) notice to Plaintiff and each member of the 1681k Notice Class at the time that they provided an employment-purposed consumer report to a user that contained public record information of the type that is likely to have an adverse effect on a consumer's ability to obtain or maintain employment.

190.    Datamaxx does not ever maintain strict procedures designed to ensure that it only furnishes complete and up-to-date public records. In fact, it uniformly fails to sell or furnish the complete public record and instead only obtains and provides the very limited data available through a batch and/or automated pickup of public records.

191.    Datamaxx's failure to timely provide the required FCRA notices to Plaintiff and the putative 1681k Notice Class members violated 15 U.S.C. § 1681k(a)(1).

192.    Datamaxx's similar failure to maintain strict procedures designed to ensure that it did not furnish incomplete or out of date public records regarding Plaintiff and the putative class members violated 15 U.S.C. § 1681k(a)(2).

193.    The conduct, action, and inaction of Datamaxx were willful, rendering Defendants liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

194.    As a result of Datamaxx's conduct, Plaintiff and the putative class have suffered particularized and concrete injuries, including being robbed of their congressionally mandated right to information to which Congress has deemed them entitled. Access to this information is important because (1) it is highly personal in nature, (2) it is maintained and reported by third parts with whom Plaintiff has no pre-existing relationship, (3) it is ultimately sold to third parties to whom Plaintiff is applying to employment or credit without Plaintiff having the opportunity to view it in advance, and (4) it is potential determinative information in extremely important interactions—applications for employment or credit.

195.    Having been denied this important information, Plaintiff and the putative class were harmed because they did not know what information was circulated about them and by

whom and were subsequently denied an opportunity to correct inaccurate or obsolete information. As a result, Plaintiff was at increased risk to be denied employment.

196.    Plaintiff and other members of the 1681k Class are entitled to recover costs and attorneys' fees as well as appropriate equitable relief from Datamaxx in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

197.    As a result of these FCRA violations, Datamaxx is liable to Plaintiff and to each Class Member for statutory damages from $100 to $1,000 pursuant to 15 U.S.C. § 1681n(a)(1)(A), plus punitive damages pursuant to 15 U.S.C. § 1681n(a)(2), and for attorneys' fees and costs pursuant to § 1681n.

198.    As a result of Datamaxx's forgoing actions Plaintiff suffered concrete economic injuries when he lost a job opportunity and income.

## COUNT FIVE: VIOLATIONS OF 15 U.S.C. § 1681e(b)
### Individual Claim Against Datamaxx

199.    Datamaxx violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's consumer report and credit file it published and maintained regarding Plaintiff by erroneously listing multiple criminal charges that were inaccurate in terms of their outcomes.

200.    As a result of Datamaxx's conduct, Plaintiff suffered actual damages such as lost wages, frustration, stress, mental distress, loss of sleep, and lost time attempting to correct the inaccuracies.

201.    Datamaxx's violation of 15 U.S.C. § 1681e(b) were willful, rendering it liable pursuant to 15 U.S.C. § 1681n. In the alternative, Datamaxx was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

202.    Plaintiff is entitled to recover actual damages and/or statutory damages, punitive damages, costs and attorneys' fees from Datamaxx in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

## X.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff and the Classes pray for relief as follows:

a)  That an order be entered certifying the proposed Classes under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff and his Counsel to represent the Classes;

b)  That judgment be entered for the proposed Classes against Defendants for statutory damages and punitive damages for violations of 15 U.S.C. § 1681b, pursuant to 15 U.S.C. § 1681n;

c)  That judgment be entered for Plaintiff individually for his actual damages for Datamaxx's violations of 15 U.S.C. § 1681e(b);

d)  That the Court award costs and reasonable attorneys' fees, pursuant to 15 U.S.C. §§ 1681n and 1681o;

e)  That the Court grant such other and further relief as may be just and proper, including but not limited to any equitable relief, that may be permitted.

**A TRIAL BY JURY IS DEMANDED.**

Dated this 22nd day of October, 2020.

Respectfully submitted,

*/s/ Brandon J. Hill*

**BRANDON HILL**
Florida Bar No. 37061
**WENZEL FENTON CABASSA, P.A.**
1110 North Florida Ave., Suite 300
Tampa, FL 33602
Direct Dial: 813-337-7992
Telephone: 813-224-0431
Facsimile: 813-229-8719
Email: bhill@wfclaw.com
Email: gnichols@wfclaw.com

and

Craig C. Marchiando
Florida Bar No. 1010769
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
Tel. (757) 930-3660
Fax (757) 930-3662
Email: craig@clalegal.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 22nd day of October, 2020, the foregoing was electronically filed with the Clerk of the Court via the CM/ECF system, which will send a notice of electronic filing to all parties and/or counsel of record.

Additionally, this Amended Complaint will be served on Datamaxx Applied Technologies, Inc., d/b/a Redtail Security and Screening, in accordance with the Federal Rules of Civil Procedure.

*/s/ Brandon J. Hill*
**BRANDON J. HILL**